UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――

JENNA PIERSON,                                        02-CV-0917E(Sr)

               Plaintiff,                           MEMORANDUM

     -vs-                                              and

COLUMBUS MCKINNON CORPORATION,                  ORDER[1]

             Defendant.

―――――――――――――――――――――――――

Plaintiff Jenna Pierson, proceeding *pro se*, commenced this action on December 19, 2002 against defendant Columbus McKinnon Corporation, the parent company of her former employers, for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e *et seq*.  Plaintiff alleges that defendant and its subsidiaries — her former employers Washington Equipment and Abell-Howe Crane ("Abell-Howe"), both of which merged in March 2001 with Gaffey, Inc. to form another subsidiary of defendant, Crane Equipment & Services, Inc. — subjected her to a hostile work environment, caused her to suffer from wage discrimination, retaliated against her and constructively discharged her.  On July 26, 2004 defendant moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure ("FRCvP") seeking to dismiss all of plaintiff's claims.  Defendant claims that plaintiff (1) has failed to state a cognizable claim of hostile work environment or retaliation under Title VII, (2) is unable to demonstrate that any disparity in compensation was attributable to her gender, (3) was not constructively discharged and (4) has sued the wrong defendant, as she

―――――――――――――――――――

[1]This decision may be cited in whole of in any part.

worked for defendant's subsidiaries but never for defendant itself.  For the foregoing reasons, defendant's Motion will be granted and plaintiff's claims will be dismissed.[2]

The facts, in the light most favorable to plaintiff — the non-moving party —, are found as follows and are undisputed except where otherwise noted.  Plaintiff was originally hired by the President of Washington Equipment, Jeff Borders, in March 1998 to perform bookkeeping duties.  Plaintiff has an Associate's degree and, prior to her employment with Washington Equipment, had been earning $26,000 per year.   Based on her prior work experience, education and salary history and the Eureka, Illinois market where she was to be employed, Borders started plaintiff at a wage of $10 per hour.  Plaintiff consistently received positive evaluations and, by December 21, 1998 — only nine months after commencing her employment —, plaintiff had received four raises, resulting in a wage of $12.75 per hour. Plaintiff admits that she was pleased with these raises and that Borders had treated her fairly.

Plaintiff nevertheless first submitted her resignation in December 1998, but Borders convinced her to stay with Washington Equipment.  Plaintiff, however, wanted to work closer to home, so she resigned from Washington Equipment in March 1999.  She became employed by Midwest Construction earning between $12 and $13 per hour.  During this time, in 1999, defendant purchased Washington Equipment.  Plaintiff returned to Washington Equipment in January 2000 as a full-charge bookkeeper — one position above that which she had previously held at Washington Equipment — earning a wage of $14.25 per hour.  Plaintiff was elevated

---

[2]On June 16, 2004 plaintiff filed a Motion to Quash Subpoenas, which, as a result of this Order dismissing plaintiff's claims, will be moot.

to controller a few months later whereby she became a salaried employee.  As controller, plaintiff was responsible for certain human resources functions as well as general controller duties.  Plaintiff claims that, as controller, she was responsible for more documentation than her predecessor.  In May 2001 plaintiff also took over controller responsibilities for Abell-Howe, which was accompanied by a raise.  Nevertheless, many Abell-Howe employees came to plaintiff with their human resources inquiries.  In August 2001 the human resources duties at both Washington Equipment and Abell-Howe were taken over by Sherrie Boyer.  Plaintiff thereafter concentrated exclusively on her controller work and continued to do so for the remainder of her employment.

Plaintiff declined a promotion offered to her in late 2001 or early 2002 to be the controller for the Gaffey division of Crane Equipment because it required her to travel and she had concerns about allegedly unfair compensation subsequent to such a promotion.  Even without taking this promotion, plaintiff continued to receive favorable evaluations and increases in compensation such that her compensation at the time of her final resignation on July 9, 2002 was almost twice that with which she had begun.

Plaintiff claims that, during the course of her employment, (1) she was subjected to a hostile work environment resulting from Borders's temper and response to the concerns of two of her assistants, (2) defendant instituted a discriminatory curtailment policy that temporarily reduced the compensation of many of its employees, (3) defendant compensated its controllers in a discriminatory manner, (4)  she was retaliated against for complaining about the

curtailment policy, Washington Equipment's accounting practices and a female co-worker's behavior towards her and (5) she was constructively discharged.

Plaintiff claims that Borders's temper created a hostile work environment. According to plaintiff, "[t]he whole office would hear his yelling and screaming, whether he was with someone in his office, on the phone, or out walking around the office area or shop."  (Pl.'s Statement of Material Facts ¶18.)  Plaintiff further claims that Borders would kick things when angry.  Plaintiff admits that Borders's temper was exposed to men and women alike and that his outbreaks of anger were not aimed at her — or anyone else's — gender.  Plaintiff's hostile work environment claim also includes an allegation that Borders had instructed her to ignore her two assistants' human relations complaints about Abell-Howe's management of its timecards and enforcement of its forty-hour work week.  Plaintiff maintains that she was uncomfortable when Borders instructed her to do nothing about these complaints.

Plaintiff next claims that defendant's curtailment policy unfairly reduced the compensation of defendant's female employees.  In August 2001 defendant was facing financial difficulties.  To address this issue, defendant directed its various subsidiaries and divisions, including Washington Equipment, to temporarily reduce the compensation of many of its employees by ten percent (hereafter "the curtailment").  In exchange, these employees would be entitled to take one day off every two weeks.  Borders resisted enacting the curtailment for as long as he could, but was forced to put it into effect on October 22, 2001. The curtailment remained in effect until November 26, 2001.  Defendant advised Borders to exempt from the curtailment those employees doing outside sales or manufacturing-related

work because they were most directly responsible for generating revenue for the company.  All such employees were male.  According to plaintiff, Borders exempted five additional male employees who, based on defendant's guidelines, should have been included in the curtailment.  Plaintiff thus claims that the curtailment was discriminatory because, while no females were exempt from the curtailment, only fourteen percent of men were affected by it, and that it would have been more equitable if no employees were exempted.  Defendant, in response, asserts that it had 42 male and only ten female employees.  Furthermore, Borders and Hake — both of whom plaintiff claims were involved in retaliating against her — were affected by the curtailment.

With regard to her wage discrimination claim, plaintiff asserts that defendant's male controllers — Benny Wong, the controller of Abell-Howe, and Brian Woltz, the controller of Gaffey — were paid higher wages than plaintiff although they allegedly had the same responsibilities and performed the same tasks.  In particular, Wong received a starting annual salary of $60,000 and, in 2001, received an increase to $61,880.  Woltz started at an annual salary of $39,000 and received one raise, resulting in a salary of $41,600.  Plaintiff, upon being made a salaried employee, was assigned an annual salary of $32,864.  Her subsequent raises resulted in her annual salary to increase to $40,944.80 by November 2001.[3]  Plaintiff alleges that her raises were appropriate because they were based on her receiving additional responsibilities.  Defendant contends that plaintiff cannot compare herself to Wong or Woltz

---

[3]Plaintiff's salary increased as follows: (1) in June 2000 to $35,478.56, (2) in May 2001 to $38,604, (3) in June 2001 to $39,956.80 and (4) in November 2001 to $40,944.80.

because (1) Borders was not responsible for determining Wong's and Woltz's compensation, (2) Wong had a Bachelor's and a Master's Degree and had been earning between $62,000 and $64,000 in his previous jobs, (3) Wong, Woltz and plaintiff each worked for separate divisions of Crane Equipment — which, until they merged in March 2001, were independent companies — located in different markets — *viz.*, Wong worked in Fort Worth, Texas, Woltz in a suburb of Chicago and plaintiff in central Illinois — and (4) Gaffey is a considerably larger business than Washington Equipment, with approximately three times the number of employees. Plaintiff, in response, maintains that Borders had to approve the raises of all the controllers.

Next, plaintiff contends that she was retaliated against for complaining about defendant's curtailment policy, her compensation, a female co-worker's behavior towards her and defendant's accounting practices. Plaintiff claims that she raised these issues with Borders, Boyer and/or Debbie Dittmar, defendant's Human Resources Manager, and that, as a result of her complaints, she gradually lost some of her duties and responsibilities — in particular, the human resources component of her position and some supervisory responsibilities — and her performance was questioned for the first time since the commencement of her employment.

Plaintiff asserts that her responsibilities had diminished in retaliation for her complaints. The Human Resources Manager position was given to Boyer in August 2001, plaintiff's assistants were terminated and replaced by Kim Hake, leaving her with no one to directly supervise and only a receptionist and Kim Hake to help her. In October 2001 plaintiff spoke with Borders about how she was not pleased with her minor increase in wages although she had taken on the responsibilities at Abell-Howe.

Plaintiff claims that the verbal reprimand she received on June 10, 2002 was retaliatory. Plaintiff had complained to Boyer about the behavior of Hake, who had become the controller of Gaffey in January 2002 — to wit, that Hake was condescending to plaintiff and, in early 2002, had moved plaintiff's files and rearranged her office without plaintiff's permission. Boyer arranged a meeting between Borders, Boyer and plaintiff, during which Borders asked plaintiff if she would like to file a formal complaint about Hake's behavior, to which plaintiff said "Yes." Plaintiff claims that, at the same meeting, she received a verbal reprimand for submitting a budget file that included confidential salary information. Plaintiff claims that it was an honest mistake but admits that she did deserve the warning. However, she claims that she should have received the warning immediately following the incident in April rather than in June 2002. As such, she asserts that the warning was in retaliation for her complaints about Hake. Plaintiff admits that Hake was condescending towards both men and women and does not claim that the verbal reprimand or Hake's behavior was due to her gender.

Borders and Boyer also raised an issue with plaintiff's performance by telling her that they had received complaints from other employees about plaintiff's demeaning behavior. Once again, plaintiff claims that, if such was not in retaliation for her complaints about Hake, it should have been brought to her attention immediately after the complaints were made. To further support her retaliation claim, plaintiff contends that this was the first time that Borders had raised an issue with plaintiff's performance.

Following this meeting, on June 13, 2002, plaintiff wrote to Timothy Harvey, defendant's General Counsel and Secretary, accusing Borders and Washington Equipment of

- 7 -

improper accounting practices.  Plaintiff alleges that Washington Equipment added unnecessary

expenses to an already-completed job, avoided adding expenses to a job that was over-budget

and took inventory in a suspicious manner.  Defendant initiated an investigation in response

to plaintiff's complaints of accounting improprieties and concluded that nothing inappropriate

had taken place.

Plaintiff submitted her resignation shortly thereafter on July 2, 2002 with July 9, 2002

as her departure date.  Plaintiff claims that she had decided to resign after the curtailment in

October 2001 but stayed in hopes that Borders would be replaced and that Washington

Equipment's new accounting software program — implemented in the spring of 2002 — would

prevent the continuation of the allegedly improper accounting practices.  Plaintiff claims that

she was constructively discharged because her responsibilities were reduced and then her

performance was questioned.  On August 2, 2002 plaintiff filed a charge of discrimination with

the Equal Employment Opportunity Commission, which on September 19, 2002 was dismissed

for lack of probable cause.  Plaintiff claims that her resignation amounts to constructive

discharge, but does admit that Borders did not want her to leave.

Summary judgment may be granted if the evidence offered shows that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law.  FRCvP 56(c).  There is no genuine issue for trial unless the evidence offered

favoring the non-moving party would be sufficient to sustain a jury's verdict for that party.

*Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, when reasonable minds

could not differ as to the outcome of an issue, summary judgment is appropriate on that issue.

*Id.* at 251-252.  The moving party initially bears the burden of showing that no genuine issue of material fact is present but the opposing party must then "set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 250.  If the non-moving party fails to establish, after a reasonable opportunity for discovery, the existence of an element essential to that party's claim and on which it will bear the burden of proof at trial, summary judgment is appropriate because such failure to establish an essential element of the case renders all other facts immaterial.  *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322-323 (1986).

When assessing the record in making a summary judgment determination, a court must view all ambiguities and factual inferences in the light most favorable to the non-moving party.  *Adickes* v. *S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  However, the non-moving party "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  FRCvP 56(e); *Gottlieb* v. *County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).

Of course, the summary judgment standard applies with equal force to discrimination cases as it does to other cases.  *See Ashton* v. *Pall Corp.*, 32 F. Supp. 2d 82, 87 (E.D.N.Y. 1999) ("[T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to commercial or other areas of litigation.") (quoting *Meiri* v. *Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).  However, courts must be aware of the fact that evidence of discrimination is rarely overt.  *See Bickerstaff* v. *Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) ("[E]mployers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason expressly

forbidden by law.") (quoting *Ramseur* v. *Chase Manhattan Bank*, 865 F.2d 460, 464-465 (2d Cir. 1989)).  In addition, courts must "also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Ibid.*  Thus, the issue for the court is "whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances." *Ibid.*

Plaintiff first claims that she was subjected to a hostile work environment.  She does not, however, allege that any hostility was due to her gender and therefore does not state an actionable hostile work environment claim.  Title VII states that "[i]t shall be an unlawful employment practice for an employer ∗∗∗ to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ∗∗∗."  42 U.S.C. §2000e-2(a)(1). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris* v. *Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quotations and citations omitted).  For plaintiff to establish a Title VII violation based on a hostile work environment claim, she must show "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Richardson* v. *New York State Dep't of Corr. Serv.*, 180 F.3d 426, 436 (2d Cir. 1999) (quotations and citations omitted).  Although actionable harassment need not take the form of sexual advances or other explicitly sexual

conduct, "the plaintiff is required to establish that the harassment complained of was based on her gender." *Galdieri-Ambrosini* v. *Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998) (citations omitted). To show that the allegedly harassing conduct was motivated by gender or that "gender played a motivating part in an employment decision," a female plaintiff must show that one of the reasons for the harassment or the decision was that she "was a woman." *Price Waterhouse* v. *Hopkins*, 490 U.S. 228, 250 (1989).

Plaintiff does not allege that her workplace was permeated with *discriminatory* intimidation; she alleges, at the most, that her workplace was permeated with intimidation not aimed at one gender or person but directed generally towards all employees. Plaintiff admits that Borders's bad temper was known and felt by all employees — male and female — and does not allege that Borders's comments made while angry were discriminatory or motivated by gender. Furthermore, there is also no indication or allegation that Borders's instruction to ignore the complaints of plaintiff's two assistants was motivated by gender or that the reason for his instruction was that plaintiff is a woman. As such, plaintiff's hostile work environment claim will be dismissed.

Next, plaintiff alleges that the curtailment was discriminatory. As plaintiff is proceeding *pro se*, it is difficult to discern her legal arguments. Thus, this Court will assume that she claims that the curtailment rises to the level of an adverse employment action and that the curtailment is also part of her wage discrimination claim. Plaintiff cannot prevail under either theory because she admits that she has no evidence raising an inference of discrimination and does not compare herself to a similarly situated male.

In a Title VII claim, plaintiff bears the burden of initially making out a *prima facie* case of discrimination.  *St. Mary's Honor Ctr.* v. *Hicks*, 509 U.S. 502, 506 (1993); *Texas Dep't of Cmty. Affairs* v. *Burdine*, 450 U.S. 248, 252-253 (1981).  If plaintiff succeeds in proving the *prima facie* case, the burden shifts to defendant "to articulate some legitimate, nondiscriminatory reason" for the alleged employment action.  *Burdine*, at 253 (quoting *McDonnell Douglas* v. *Green*, 411 U.S. 792, 802 (1973)).  Finally, "should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Id.* at 253 (quoting *McDonnell Douglas*, at 804).

To make out a *prima facie* case of discrimination under Title VII, plaintiff must allege and prove that (1) she is a member of a protected class, (2) she was performing her job satisfactorily, (3) she was subjected to an adverse employment action and (4) either the adverse employment action occurred under circumstances giving rise to an inference of discrimination or similarly situated males were treated differently.  *McDonnell Douglas*, at 802; *Graham* v. *Long Island Rail Road*, 230 F.3d 34, 38 (2d Cir. 2000); *Reimer* v. *Heritage Asset Mgmt.*, 1999 U.S. Dist. LEXIS 9295, at *11 n.3 (W.D.N.Y. June 15, 1999).  It is undisputed that plaintiff is a member of a protected class and that she was performing her job satisfactorily.  Plaintiff alleges either that the curtailment was an adverse employment action or that her constructive discharge was an adverse employment action.  As this Court will hold, plaintiff was not constructively discharged.  Assuming *arguendo* that the curtailment was an adverse employment action, plaintiff does not allege and cannot show that it occurred under

circumstances giving rise to an inference of discrimination or that similarly situated males were not subject to the curtailment and, in the alternative, cannot show that defendant's proffered reason is a pretext for discrimination.

First, plaintiff does not attempt to identify a similarly situated male employee who was exempt from the curtailment.  Thus, her only remaining argument is that discrimination can be inferred from the curtailment.  Plaintiff claims that the curtailment was specifically set up to harm the female while protecting the male employees.  Not only is this hard to believe because the curtailment only lasted one month and the male President of Washington Equipment, Borders, was also affected by the curtailment, but plaintiff also admits that she "cannot substantiate this claim with evidence."  (Pl.'s Aff. at "Curtailment" ¶3.)  Moreover, defendant has articulated a legitimate, nondiscriminatory reason for the curtailment — *viz.*, outside salespeople and manufacturing personnel are most directly responsible for generating revenue for the company and thus it would be against defendant's best interests to reduce their compensation and permit them to take a day off every two weeks.  Plaintiff's only response to this is that all employees should have been subjected to the curtailment to prevent the curtailment from being discriminatory.  This is not sufficient to meet her burden because "the evidence must--at a minimum -- create a genuine issue of fact as to [defendant's] offered reasons or as to a discriminatory motive."  *Dister* v. *Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988) (citing with approval First Circuit cases holding that the "plaintiff cannot prove pretext ∗∗∗ 'simply by refuting or questioning the defendants' articulated reason'") (citations omitted); *see also, Batista* v. *Union of Needleworkers, Indus. & Textile Employees*

- 13 -

*AFL-CIO*, 2000 U.S. Dist. LEXIS 17294, at *10 (S.D.N.Y. Nov. 30, 2000) (dismissing the plaintiff's disparate pay and disparate employment conditions claims because she "submit[ted] no evidence disputing" the defendant's assertions).   Therefore, plaintiff's claim that all should have been subject to the curtailment without any evidence of discriminatory motive does not meet her burden in establishing a *prima facie* case of discrimination or that defendant's proffered reason is a pretext for discrimination.   As such, plaintiff's discrimination claim will be dismissed.

Plaintiff next claims that she was subjected to wage discrimination as evidenced by her salary and the curtailment.   To make out a *prima facie* case of wage discrimination, plaintiff must demonstrate that (1) defendant paid different wages to the male employees, (2) those male employees performed equal work on jobs requiring equal skill, effort and responsibility and (3) those jobs were performed under similar working conditions.   *Corning Glass Works* v. *Brennan*, 417 U.S. 188, 195 (1974); *Tomka* v. *Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742 (1998) (citations omitted); *Aldrich* v. *Randolph Cent. Sch. Dist.*, 963 F.2d 520, 524 (2d Cir. 1992). Wage discrimination claims under Title VII are generally analyzed under the same standard as claims asserted under the Equal Pay Act ("EPA").[4]   Hence, similar to a claim under the EPA, a plaintiff bringing a Title VII claim for unequal pay must show that she "was paid less than men for the same work",  *Fayson* v. *Kaleida Health, Inc.*, 2002 U.S. Dist. LEXIS 18591, at *21

---

[4]Title VII claims also require the plaintiff to produce evidence of discriminatory animus in order to make out a *prima facie* case of intentional gender-based wage discrimination. *Tomka*, at 1312-1313.

(W.D.N.Y. Sept. 18, 2002) (quotations and citation omitted), and that any wage disparity was due to her gender. *Tomka*, at 1313. Once the plaintiff establishes a *prima facie* case of wage discrimination, the burden shifts to the employer to "justify the wage differential by proving that the disparity results from (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Aldrich*, at 524; *see also* 29 U.S.C. §206(d)(1); *Tomka*, at 1310. A gender neutral job classification system, without more, is insufficient to meet an employer's burden to show that a wage discrepancy is caused by a factor other than sex. *Id.* at 525. Such classification system serves "as a factor-other-than-sex defense to sex-based wage discrimination claims only when the employer proves that the job classification system resulting in differential pay is rooted in legitimate business-related differences in work responsibilities and qualifications for the particular position at issue." *Ibid.* The plaintiff then has the opportunity to show that these gender-neutral reasons for differences in pay are mere pretext for discrimination. *Id.* at 526.

Plaintiff cannot meet her *prima facie* burden in a wage discrimination claim with regards to both her salary and the curtailment because she cannot show that plaintiff, Wong and Woltz and the male employees who were exempt from the curtailment performed equal work under similar working conditions. Plaintiff, in order to establish the second element of a wage discrimination claim, need not show that her job was identical to a higher paid position but that the two positions were "substantially equal." *Tomka*, at 1310. Jobs that are "merely comparable" or that have the same job title or description but different job content — *viz.*,

different tasks and responsibilities —, however, are insufficient to satisfy plaintiff's burden. *Ibid.* If the additional tasks or responsibilities of one job as compared to those of another job are substantial, then the jobs are not considered congruent and the work performed is not considered equal regardless of sharing the same job title or description. *Gerbush* v. *Hunt Real Estate Corp.*, 79 F. Supp. 2d 260, 263 (W.D.N.Y. 1999).

Plaintiff has failed to show that her position is "substantially equal" to Wong's or Woltz's position or to the positions of the employees exempt from the curtailment. First, with regards to plaintiff's salary, it is undisputed that plaintiff, Wong and Woltz each (1) worked for different corporate entities — and, prior to the merger in March 2001, different companies — (2) in different geographical locations with significant differences in cost of living and (3) with different supervisors determining their compensations. *See, e.g., Pfeiffer* v. *Lewis County*, 308 F. Supp. 2d 88, 99 (N.D.N.Y. 2004) (holding that, while there are some common grounds in the job tasks, "the performance of some common tasks does not make jobs substantially equal when material differences also exist"). Additionally, Woltz started at a salary of $39,000 per year and received one raise to $41,600 during his six months of employment as Abell-Howe's controller. Plaintiff was earning just under $39,000 and was working and living in Central Illinois, as opposed to Woltz who was working in Forest Park, Illinois, a high-paying market just outside of Chicago. Thus, undermining plaintiff's claim, in addition to facts that plaintiff and Woltz worked for different entities and had different supervisors, is the fact that plaintiff's salary was similar to, if not greater than, Woltz's when factoring in the cost of living difference. As such, plaintiff has not met her burden in showing that defendant paid Woltz different wages for the

same work or in showing that defendant's asserted reason for the minor difference in pay —
to wit, the respective cities' cost of living — is a pretext for discrimination.

Wong, in addition to the reasons set forth above, is distinguishable from plaintiff in that
he has a Bachelor's Degree and a Master's of Business Administration, had been earning
between $62,000 and $64,000 per year prior to working for defendant and was the controller
for Gaffey, which had approximately three times the number of employees as Washington
Equipment.  Plaintiff, on the other hand, had only an Associate's degree and had been earning
$26,000 per year both prior to working for Washington Equipment and during the period when
she resigned from Washington Equipment only to return nine months later in January 2000.
*See, e.g., Calvello* v. *Elec. Data Sys.*, 2004 U.S. Dist. LEXIS 8744, at *16 (W.D.N.Y. Apr. 15,
2004) ("Differences in [employees'] experience and training would also justify the differences
in their salaries."); *Shieldkret* v. *Park Place Entm't Corp.*, 2002 U.S. Dist. LEXIS 1032, at *8-9
(S.D.N.Y. Jan. 23, 2002) (finding that a higher salary based on an employee's prior work
experience is valid).  Plaintiff, therefore, has not met her burden in showing that Wong
performed equal work under similar working conditions or in showing that defendant's gender-
neutral reasons for the differences in pay are mere pretext for discrimination.

Finally, plaintiff's allegation that defendant discriminated against her with regard to her
salary is further undermined by the fact that defendant gave her multiple promotions and raises
during the course of her employment. *See Fayson*, at *21 n.17 (finding that a promotion
coupled with a sixteen percent pay increase "severely undercuts" the plaintiff's allegations of
wage discrimination).  Plaintiff's salary more than doubled during the course of her

employment with Washington Equipment. Accordingly, plaintiff's wage discrimination claim with regard to her salary will be dismissed.

Next, plaintiff claims that the curtailment resulted in wage discrimination. Plaintiff, however, does not allege that the male employees who were exempt from the curtailment performed equal work. In fact, it is clear that the men exempted from the curtailment performed vastly different work — to wit, they were outside salespeople and manufacturing personnel who were most directly responsible for generating revenue for defendant whereas plaintiff was a controller in charge of accounts payable. *See Tomka*, at 1313 (holding that differences in pay alone cannot sustain a pay discrimination claim). Plaintiff alleges that, in addition to the outside salespeople and manufacturing personnel, Borders exempted managers and assistant managers. Assuming this was the case, plaintiff was never a manager or an assistant manager and does not allege that her job was in any way similar to those of the exempt managers or assistant managers. Thus, plaintiff's wage discrimination claim regarding the curtailment will be dismissed.

Turning to plaintiff's retaliation claim, Title VII makes it unlawful for an employer to retaliate against an employee because she has opposed discrimination in the workplace. To establish a *prima facie* case of retaliation, plaintiff must show "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging [her]; and (3) a causal connection between the protected activity and the adverse employment action." *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) (quotations and citation omitted). Plaintiff claims that she was retaliated against for complaining about the curtailment, her wages, Hake's

behavior and the accounting practices.   Her complaints about Hake's behavior and the accounting practices, however, were not made in opposition to discrimination in the workplace and thus are not protected activities.   As such, plaintiff's only remaining claim is that her complaints about the curtailment resulted in an adverse employment action — *viz.*, a loss of some of her duties and responsibilities.   Plaintiff's alleged adverse employment action, however, did not materially alter the terms and conditions of her employment and thus does not rise to the level of an adverse employment action.   Therefore, plaintiff's retaliation claim will be dismissed.

The Second Circuit has held that, to constitute an adverse employment action within the context of a Title VII claim, a plaintiff must demonstrate that an employment action was one that resulted in a "materially adverse change in the terms and conditions of her employment[,]" which "must be more disruptive than a mere inconvenience or an alteration of job responsibilities."   *Galabya* v. *New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quotations and citation omitted).   "To be adverse, an employment action must involve the deprivation of some tangible job benefits such as compensation, terms, conditions or privileges of employment."   *Murphy* v. *Bd. of Educ. of the Rochester City Sch. Dist.*, 273 F. Supp. 2d 292, 304 (W.D.N.Y. 2003) (citations and quotations omitted).   Examples of what constitute a materially adverse change include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."   *Galabya*, at 640 (internal quotations omitted).   "Adverse employment actions are

considered material if they are of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Murphy*, at 304. "[T]rivial complaints about an unpleasant working environment", however, do not constitute adverse employment actions. *Phillips* v. *Bowen*, 278 F.3d 103, 117 (2d Cir. 2002). The test is an objective test where a reasonable person under the circumstances would view the employment action as materially adverse; "[o]therwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Murphy*, at 304. (citations and quotations omitted).

Plaintiff claims that she suffered adverse employment actions when her responsibilities were diminished. In particular, she alleges that (1) the Human Resources Manager position was given to Boyer in August 2001 leaving plaintiff without any human resources duties, (2) her assistants were terminated and replaced by Hake and (3) Hake became the controller of Gaffey in January 2002, leaving plaintiff with no one to supervise. First, Boyer's assignment occurred before the curtailment and as such could not have been retaliatory. Plaintiff's only remaining allegation of an adverse employment action is that her supervisory role diminished. No reasonable trier of fact could find that this resulted in a materially adverse change in working conditions. *See Reed* v. *Belknap Heating & Cooling, Inc.*, 2004 U.S. Dist. LEXIS 7365, at *33 (W.D.N.Y. Apr. 20, 2004) (Elfvin, J.) (holding that the plaintiff's reduction in her job duties did not amount to an adverse employment action). Plaintiff's role as supervisor was not a "material responsibilit[y]" of her position as controller and the alleged loss of her supervisory role did not result in a decrease in wage or a demotion. *Galabya*, at 640. In fact,

plaintiff received a raise subsequent to her complaints about the curtailment and plaintiff admits that Borders "didn't want to lose" her. (Pl.'s Aff. at "Retaliation" ¶6.) In light of these facts, a reasonable employee would not find the conditions of her employment altered for the worse and, as such, plaintiff has not satisfied her burden to show that she suffered an adverse employment action. Accordingly, plaintiff's retaliation claim will be dismissed.

Plaintiff has also failed to raise a genuine issue of material fact that she was constructively discharged. In order to maintain her claim, she must show that defendants deliberately made her working conditions so intolerable that she was forced to resign. *See Spence* v. *Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir.1993). In addition, plaintiff must also show that such working conditions were "so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign." *Stetson* v. *NYNEX Serv. Co.*, 995 F.2d 355, 361 (2d Cir. 1993) (quotation marks and citation omitted). "[M]ere dissatisfaction with work assignments, unfair criticism, or working conditions that can be categorized as unpleasant, do not constitute a constructive discharge." *O'Dell* v. *Trans World Entm't Corp.*, 153 F. Supp. 2d 378, 393 (S.D.N.Y. 2001). Although plaintiff has shown that Borders had a temper and that defendant did enact the curtailment, she has not shown that defendant deliberately made her working conditions so intolerable that a reasonable person would have felt compelled to resign. In fact, Borders repeatedly asked plaintiff to stay with Washington Equipment and constantly gave her raises and promotions. *Cf. Grady* v. *Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) (finding that there is a strong presumption against discrimination where the same supervisor who hired the employee is alleged to have taken

adverse actions against the employee within a few years).  Plaintiff, therefore, cannot show any *deliberate* attempt by defendant to make her working conditions intolerable.  Furthermore, Borders's temper was felt by all employees and the curtailment was imposed on all female employees and several male employees and such did not make these other employees' working conditions so intolerable that resignation was their only option.  Finally, plaintiff claims that she decided to resign after the curtailment in October 2001.  She, however, did not start looking for another job until April 2002 and did not resign until July 2002, over eight months after she claims to have been forced to resign.  If her working conditions were as intolerable as plaintiff claims them to be, she could not have waited eight months to resign.  Therefore, plaintiff's constructive discharge claim will be dismissed.

Finally, plaintiff filed a Motion to Quash Subpoenas on June 16, 2004, which is mooted as a result of this Order.

Accordingly, it is hereby **ORDERED** that defendant's Motion for Summary Judgment is granted in its entirety and that the Clerk of the Court shall close this case.

DATED:        Buffalo, N.Y.

        May 6, 2005

                                  /s/ John T. Elfvin
                                    JOHN T. ELFVIN
                                      S.U.S.D.J.